☑ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

2:47 pm, Apr 30 2025
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____M.D._____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK ANDROID CELLPHONE SEIZED FROM KELON DUKES ("DEVICE"),<br><br>CURRENTLY LOCATED AT THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES HYATTSVILLE I FIELD OFFICE, 7833 WALKER DRIVE, SUITE 600, GREENBELT, MARYLAND | Case No. 8:25-mj-00625-TJS |

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH WARRANT**

I, Aaron Moon, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure to search the following:

    a. A black Android cellphone seized from **KELON DUKES** during his arrest on March 1, 2025 ("**DEVICE**"), which is currently located at the Bureau of Alcohol, Tobacco, Firearms, and Explosives Hyattsville I Field Office, 7833 Walker Avenue, Suite 600 Greenbelt, Maryland, as further described in Attachment A, for evidence described in Attachment B.

2. Based on my training, experience, and the facts in this affidavit, there is probable cause to believe that:

    a. **DUKES** has committed violations of 18 U.S.C. § 922(j) (possession of a stolen firearm) and 18 U.S.C. § 933 (firearms trafficking) (the "Target Offenses"), among other federal criminal statutes; and

    b. Records and information associated with the **TARGET DEVICE** will contain evidence, instrumentalities, contraband, or fruits of the Target Offenses.

3. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), assigned to the Hyattsville I Field Office. I have been employed by the ATF since July 2022. As a Special Agent, I am "an investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2515, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2515.

4. I have successfully completed the Federal Law Enforcement Training Center Criminal Investigator Training Program and the ATF's Special Agent Basic Training program for a combined period of 26 weeks. Prior to my employment with the ATF, I was a Police Officer with the United States Park Police. I have successfully completed the Federal Law Enforcement Training Center Uniformed Police Training Program and the United States Park Police Agency Specific Basic Training for a combined period of 18 weeks.

5. As an ATF Special Agent, I have received extensive training in investigating and enforcing the firearms laws of the United States. I have participated in investigations involving firearms trafficking, possession of firearms by prohibited persons, illegal possession of firearms regulated under the National Firearms Act, commercial armed robberies, and burglaries of Federal Firearms Licensees ("FFLs"). I have interviewed witnesses and defendants in connection with these investigations and prosecutions, and I have conducted covert surveillance of firearms traffickers and individuals in illegal possession of firearms. I have also executed federal search warrants and arrest warrants involving firearm offenses.

6. Through my training, knowledge, and experience, I have become familiar with the methods and techniques associated with firearms trafficking, as well as the use of communication devices in furtherance of firearms trafficking. Through my training and experience, I have gained

familiarity with the operation of firearms trafficking, including their methods for procuring and distributing firearms, as well as their laundering of proceeds related to these illicit activities.

7. As a result of these experiences, I have become familiar with the common means and methods by which firearms traffickers communicate, common patterns of activity, the types and amounts of profits made, and the methods, language, and terms that traffickers use.

8. Based on my training, knowledge, experience, and participation in firearms trafficking investigations, and the training and experience of other law enforcement officers with whom I am working closely in this investigation, I also know that that firearms traffickers use cellphones in furtherance of trafficking. In particular, I know that:

   a. Firearms traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another and their potential customers without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities.

   b. Firearms traffickers communicate by use of text messaging to discuss types, quantities, and prices of firearms, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement. Firearms dealing is an ongoing process that requires the development, use, and protection of a communications network to facilitate distribution.

   c. To that end, firearms traffickers use communication facilities (including cellphones) to further every aspect of the firearms trade. Firearms traffickers use communication facilities to contact—by way of both voice call and electronic message—firearms suppliers, customers, and coconspirators, all for the purpose of acquiring, storing, transporting, and distributing firearms. Firearms traffickers also maintain, on their cellphones, records related to firearms distribution (e.g., ledgers and notes pertaining to firearms sales), and photographs of firearms, firearms parts, the instruments of the firearms trade (including machine tools), and records and receipts regarding the proceeds of firearms distribution as well as the disposal, transfer, or expenditure of such monies. Firearms traffickers often maintain such evidence on their cellphones for long periods of time. Further, the location data associated with a firearms trafficker's cellphones assists investigators in identifying the firearms trafficker's residence, stash house, coconspirators, the residences of the trafficker's coconspirators, and meeting locations.

    d. Those who distribute firearms maintain records electronically and in hard copy—including ledger books, records, receipts, notes, bank and credit card records, money orders, cashier's checks, bus and plane tickets, records indicating the existence of a storage facility, and other records—relating to the importation, manufacture, transport, ordering, sale, and distribution of firearms. Those records are commonly maintained in secure locations to which firearms traffickers have ready access, such as data storage devices that can store digital photographs, ledgers, cryptocurrency addresses, and locations of secured locations, among other items and records related to firearms trafficking. Firearms traffickers often maintain such evidence for long periods of time.

    e. Firearms traffickers often maintain contraband and instrumentalities related to the activity at secured locations, such as cellphones.

    f. Firearms traffickers often take photographs of themselves, their associates, their property, and illegal contraband. Such photographs are usually maintained in one or more secured locations, including on cellphones, digital cameras, or computers found within such locations.

    g. The location information associated with a firearms trafficker's cellphone assists law enforcement with identifying the firearms trafficker's residence, identity, buyers, coconspirators, suppliers, stash houses, meeting locations, and the financial institutions where the firearms trafficker launders proceeds.

9. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a search and seizure warrant, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

10. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

11. The property to be searched is a black Android cellphone in a black case, hereinafter the "Device." The Device is currently located at the ATF Hyattsville I Field Office, 7833 Walker Drive, Suite 600, Greenbelt, Prince George's County, Maryland, in the evidence vault.

12. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### *Case Background*

13. On November 20, 2024, at approximately 9:30 a.m., Charles County Sheriffs Office's (CCSO) Criminal Investigations Division and ATF personnel responded to Business-1 located at 10525 Theodore Green Boulevard, White Plains, Charles County, Maryland for a commercial burglary at an FFL business. An inventory of the FFL determined that approximately 113 firearms and 32 silencers were reported stolen, and evidence from the scene led officers to the identification of Malcolm **OSHIN** as a suspect.

14. On December 30, 2024, a firearm was recovered from an individual arrested by the New Carrolton Police Department in Prince George's County, Maryland. Law enforcement queried the firearm in a law enforcement database, which yielded that the firearm was reported stolen from Business-1 on or about November 20, 2024.

15. On January 16th, 2025, the Honorable Gina Simms, United States Magistrate Judge for the United States District Court for the District of Maryland, signed and approved the search and seizure warrants for: the person of **OSHIN** and the residence located at 3235 75th Avenue, Apt 104, Hyattsville Maryland. On the same date, the Honorable Patrick J. Devine for the Charles County District Court, signed and approved a residential search and

seizure warrant for OSHIN's girlfriend—Kaitlyn Persaud—at 3215 75th Avenue, Apt 302, Hyattsville Maryland.

16. On January 17, 2025, law enforcement officers executed the federal and state search and seizure warrants. As a result, law enforcement recovered three firearms. Two of the firearms were reported stolen from an FFL in White Plains, Maryland on or about November 20, 2024 based on information obtained from a law enforcement database.

*Firearm Recovery*

17. On or about March 1, 2025, **DUKES** was apprehended by the Washington Metropolitan Police Department ("MPD"). Officers arrested **DUKES** for public consumption of marijuana. During a search incident to arrest, officers recovered marijuana, U.S. currency, the Device, and a Sig Sauer P365 9mm semi-automatic firearm bearing serial number 66G022116. Law enforcement queried the recovered firearm in a law enforcement database and discovered that it was reported stolen from Business-1 on or about November 20, 2024. **DUKES** was transported to the MPD Seventh District Police Station for processing.

18. Your Affiant and an MPD detective interviewed **DUKES** at the MPD Seventh District Police Station shortly after his arrest. **DUKES** waived his Miranda rights and agreed to answer questions. During his interview, **DUKES** admitted to being in possession of the firearm that officers recovered from his person earlier that day but stated that he did not steal a firearm from an FFL.[1] **DUKES** also admitted to purchasing the firearm from an individual approximately

---

[1] Individuals who purchase firearms from their associates will often communicate with these associates using cellular devices to facilitate the sale and acquisition of firearms.

6

one month prior to his arrest for approximately $500 U.S. currency, but did not want to disclose the identity of the seller.

19. On or about March 3, 2025, law enforcement confirmed that the recovered firearm belonged to Business-1 by making a cross-reference check of the make, model, and serial number of the recovered firearm with Business-1's theft/loss report.

20. The Device is currently in the lawful possession of the ATF. It came into the ATF's possession in the following way: it was seized during **DUKES'** arrest and transferred from MPD custody to ATF custody at the MPD Seventh District Police Station. Your Affiant is seeking a warrant so that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

21. The Device is currently in storage at the ATF Hyattsville I Field Office, 7833 Walker Drive, Suite 600, Greenbelt, Prince George's County, Maryland in the evidence vault. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the MPD.

## TECHNICAL TERMS

22. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text

messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable

8

storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

25. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

  j. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  k. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  l. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

  m. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence

10

of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

n. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

o. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

p. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

q. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

r. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Aaron Moon
Digitally signed by Aaron Moon
Date: 2025.03.28 12:19:55 -04'00'

Aaron Moon
ATF Special Agent

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this  1st  day of April, 2025.

_____
Honorable Timothy J. Sullivan
United States Chief Magistrate Judge

# ATTACHMENT A
*Description of Property to be Searched*

The property to be searched is a black Android cellphone, hereinafter the **"Device"**. The Device is currently located at the ATF Hyattsville I Field Office at 7833 Walker Drive, Suite 600, Greenbelt, Prince George's County, Maryland.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B
*Description of Items to be Seized*

All records, documents, items, data and other information that may constitute fruits or instrumentalities of, or contain evidence related to, violations of 18 U.S.C. § 922(j) (possession of a stolen firearm) and 18 U.S.C. § 933 (firearms trafficking) (collectively the "Target Offenses"), since November 2024, including, but not limited to, the following that may be found in the **DEVICE** described in Attachment A:

a. Any and all images, videos, notes, documents, records, or correspondence pertaining to:

   i. The purchase, advertisement, and sale of firearms;

   ii. Storage of firearms; and

   iii. Removal of serial numbers and other identifying information associated with firearms.

b. Lists of customers and related identifying information;

c. Call and contact logs for customers and potential customers;

d. Types, amounts, and prices of firearms trafficked as well as dates, places, and amounts of specific transactions;

e. Any information related to sources of firearms (including names, addresses, phone numbers, or any other identifying information);

f. Any information recording **Kelon DUKES** schedule or travel from November 2024 to the present;

g. All bank records, checks, credit card bills, account information, and other financial records.

h. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

i. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical,

electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

For any computer, computer hard drive, or other physical object upon which computer data can be recorded, which includes cellular phones, tablets, iPods, and other electronic devices (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

j.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

k.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

l.  evidence of the lack of such malicious software;

m. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

n.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

o.  evidence of the times the COMPUTER was used;

p.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

q.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

r.  contextual information necessary to understand the evidence described in this attachment.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting

government examination of all the data necessary to determine whether that data falls within the items to be seized):

    a.    surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

    b.    "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

    c.    "scanning" storage areas to discover and possible recover recently deleted files;

    d.    "scanning" storage areas for deliberately hidden files; or

    e.    performing key word searches or other searches and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.